SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV–14–342

| | |
|---|---|
| CHARLES BRYAN DYER AND EDWARDS TITLE, LLC<br><br>APPELLANTS<br><br>V.<br><br><br>ARKANSAS INSURANCE DEPARTMENT<br><br>APPELLEE | **Opinion Delivered** September 2, 2015<br><br>APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT<br>[NO. 17CV-12-533]<br><br>HONORABLE GARY COTTRELL, JUDGE<br><br>AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Charles Dyer and his title-insurance agency, Edwards Title, LLC, challenge the revocation of their insurance license by appellee, the Arkansas Insurance Department (Department). Dyer appealed to the Crawford County Circuit Court, which affirmed the revocation. We affirm the circuit court and the Department.

## I. *Background*

Dyer owns Edwards Title, LLC, formerly known as Edwards Abstract Company. His business involves selling title insurance to prospective home buyers and performing closing services in real-estate transactions. Closing services include preparation of settlement documents; maintenance of an escrow account, which primarily consists of the purchase money forwarded by home buyers or their lenders; and payment of the purchase money to the seller or the seller's mortgagee.

In 2003, Dyer discovered that a trusted employee named Susan Hudson had embezzled

money from his agency. Dyer did not fire Hudson but allowed her to continue as a closer for the agency. He attempted to prevent future losses by, among other things, requiring two signatures on checks, although Hudson was retained as a signatory. He also began reconciling the escrow account weekly for a period of time.[1]

In 2008, one of Dyer's title-insurance underwriters, Chicago Title, conducted an audit of Dyer's agency. The audit found that Dyer was delinquent in performing escrow-account reconciliations and that management did not critically review or formally approve bank reconciliations. Dyer's relationship with Chicago Title was later terminated by mutual consent. Dyer then entered into a contract with another title-insurance underwriter, Stewart Title Guaranty.

Stewart conducted initial audits of Dyer and noted that Dyer had delayed in reconciling escrow accounts; had outstanding checks and deposits from 2007; experienced excessive time lapses between closing and the recording of documents; and delayed mortgage payoffs in some files. Subsequent audits identified similar issues, plus overdraft charges; insurance policies not being sent to Stewart in a timely fashion; and infrequent reconciliations.

In early 2011, Dyer learned that Susan Hudson had resumed embezzling from the agency as early as 2009. Hudson's methodology was complex but, simply put, she manipulated the agency's automated escrow accounting system, into which she entered real-estate closing information. She made entries to show that a check had been written to payoff

---

[1] An escrow account is reconciled to ensure that the money in the account has been disbursed to the proper parties in the real-estate transactions that are handled by the agency.

a seller's mortgage but, in reality, the check would be voided and the funds not disbursed—rather, the funds remained in the agency's escrow account, or one of its old escrow accounts that had never been closed. Hudson diverted some of the hidden funds for her own use, thereby leaving the seller's mortgage unpaid for a long period of time. At some point, she would use funds from a subsequent closing to satisfy the unpaid mortgage. This, however, simply resulted in the subsequent closing having a late payoff as well.

Hudson's activities were not detected by Dyer until February 2011. In that month, a bank officer called Dyer to report that the mortgage of a Mr. Mize, who had closed at Dyer's agency a few months earlier, had not been paid off. While investigating the matter, Dyer learned that Hudson had been taking money from the agency and that she had used the proceeds from the Mize closing and other closings in furtherance of her scheme. Dyer terminated Hudson and paid off the Mize loan with escrow-account funds. Approximately six weeks later, Dyer obtained a personal loan and placed $185,000 into the escrow account. During that six-week interim, there were insufficient-funds charges on the escrow account, and Dyer continued to perform closings, despite the escrow account's being short of money.

Dyer did not disclose Hudson's theft to Stewart Guaranty until September 2011. At that point, Stewart reminded Dyer to inform the Department, which Dyer did not do. Stewart also audited Dyer and terminated its relationship with him. Stewart informed the Department of its split with Dyer, and this marked the first notification to the Department about Hudson's theft.



II. *Insurance Department Investigation*

The Department launched an investigation upon learning of the situation at Dyer's agency. It obtained the files on which Hudson had been the closer between January 2009 and February 2011, and reviewed Dyer's bank statements and the audits that had been performed by Chicago Title and Stewart Guaranty.

In the course of the inquiry, investigator Sarah Gray discovered problems with over 300 of Dyer's files. Many of the files still contained the client's original title policy or original warranty deed, which had never been mailed to the client. Gray also found occasions where Dyer had waited a significant amount of time after closing to pay some insurance premiums to Stewart and had made untimely mortgage pay-offs as well. In particular, the Department learned that mortgage payoffs of two sellers were delayed to the extent that they received late notices from their banks and, in one instance, a foreclosure action was filed. Gray additionally saw that title policies were sometimes issued to the new home buyer before the previous owner's loan on the property was paid off, which was an incorrect procedure.

Probing further, Gray found that Dyer's post–2008 policies and other documents listed his business name as Charles B. Dyer d/b/a Edwards Abstract Company rather than Edwards Title, LLC, which had been his business name since January 2009. She observed that these documents also lacked Dyer's license number and the required Department contact information. Additionally, Gray learned that, during the Stewart audits, Dyer had not reported the existence of either his old escrow accounts or a high–yield "sweep" account, into which monies from the escrow account were temporarily placed to earn interest for the agency.

Another Department examiner, Taryn Lewis, investigated Dyer's files in an attempt to discover the extent of Hudson's misappropriations. Lewis observed that some of the information she found did not coincide with the information that Dyer had provided to her during the course of the investigation. Her inquiry also revealed errors, inconsistencies, and changes in Dyer's disbursement sheets and settlement statements; lack of payoff information in some files; and several transfers between escrow accounts, or between the escrow accounts and the high-yield account. Lewis questioned the effectiveness of the security measures that Dyer imposed after Hudson's 2003 theft.

The Department also received two complaint letters regarding Dyer. In one, a consumer complained that he waited five months for his title policy and that he had yet to receive his original deed. In a second, a credit union complained about Dyer's poor service and lack of timeliness in providing recorded documents and responding to questions.

The Department also discovered problems regarding funds in Dyer's bank accounts. One of his old escrow accounts had a balance of approximately $17,000 that could not be satisfactorily explained. Dyer claimed the money as his own, despite its presence in an escrow account. In another instance, a bank statement showed that, in November 2008, $159,000 had to be transferred from the sweep account to an escrow account to cover insufficient-funds fees. Finally, the Department investigated an incident in which Dyer mistakenly paid a man named James Young approximately $30,000 from an escrow account. To recover the money, Dyer sued Young, but did not replace the money in the escrow account for several years, doing so with a loan from his mother. Upon obtaining a judgment against Young, Dyer paid



back his mother and put the majority of the judgment amount into his personal account.

### III. *Administrative Hearing and Order*

As the result of its investigation, the Department scheduled an administrative hearing to address Dyer's regulatory violations and to determine whether his license should be revoked, suspended, or subject to other sanctions. The Department sent Dyer a hearing notice containing the allegations against him.

During the lengthy hearing, the Department received the abovementioned evidence, including the Stewart Title audits, the Chicago Title audit, and the complaints filed with the Department. The Department also heard the testimony of expert witness Lynn Wilburn, who stated that Dyer had not met the standards for running a title agency due to his poor financial habits and putting other people's money at risk. Wilburn cited numerous areas of concern, including overdrafts and insufficient-funds charges in escrow accounts; keeping old escrow accounts open; files without payoff statements in them; failure to perform timely reconciliations and monitor voided checks; and sellers' payoffs not being made immediately upon closing. She stated that Hudson was able to commit fraud because no one was paying attention and monitoring her.

Dyer called his own expert, who essentially testified that Dyer's practices were not unusual and did not cause harm to Dyer's customers or underwriters. Dyer's character witnesses stated that he was a reputable and knowledgeable businessman. Dyer himself testified that he had been involved in a serious car accident in October 2010 and had not been able to attend to his office duties for a significant period of time. He denied any knowledge of



Hudson's fraud and indeed there was no evidence that he benefited in any way from Hudson's scheme.

Following the hearing, the Department issued an order on October 4, 2012, revoking Dyer's license. The revocation was based on findings of misappropriation; failure to report or disclose certain matters; failure to deliver or have proper information on certain documents; and problems with record-keeping and business practices. Dyer petitioned the Crawford County Circuit Court for review, and the court upheld the Department's revocation. This appeal followed.

IV. *Standard of Review*

The Administrative Procedure Act (APA) and the Arkansas Insurance Code provide alternate means of seeking judicial review of an Department order.[2] The APA provides that an agency decision may be reversed if, among other reasons, it is not supported by substantial evidence of record.[3] The Insurance Code similarly provides that the Insurance Commissioner's findings of fact shall be conclusive if supported by substantial evidence.[4]

In administrative appeals, our review is not directed to the circuit court but to the agency's decision.[5] That is because administrative agencies are better equipped by specialization, insight through experience, and more flexible procedures than courts, to

---

[2] *Travelers Indem. Co. v. Monroe*, 257 Ark. 1029, 522 S.W.2d 431 (1975).

[3] Ark. Code Ann. § 25-15-212(h)(5) (Repl. 2014).

[4] Ark. Code Ann. § 23-61-307(g)(2) (Repl. 2012).

[5] *Obigbo v. Ark. State Bd. of Nursing*, 2014 Ark. App. 675, 449 S.W.3d 335.

determine and analyze legal issues affecting their agencies.[6] As mentioned, agency decisions will be upheld if they are supported by substantial evidence.[7] To establish a lack of substantial evidence, the appellant must demonstrate that fair-minded people could not, on the evidence submitted, reach the conclusion arrived at by the agency.[8] On appeal, we give the evidence its strongest probative force in favor of the agency's findings.[9] The question is not whether the evidence would support any other finding but, instead, whether the evidence supports the finding that was made.[10]

## V. *Hearing Notice*

Dyer argues first that the hearing notice sent to him by the Department did not provide sufficient warning of the allegations against him.[11] We disagree.

The notice contained twelve lettered paragraphs describing Dyer's alleged misconduct. The list of allegations included: diverting, misappropriating, or failing to account for escrow funds and premiums; failing to report employee theft; not reporting policies or timely remitting premiums to the underwriter; issuing title policies prior to paying off the mortgage; not delivering policies to the consumer in a timely manner; not putting proper information

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] Dyer does not challenge the timing of the notice.

on documents, such as the agent's license number, correct company name, Department contact information, and a required statutory notice; and failing to maintain records in closing files and records of escrow accounts. Each paragraph designated a corresponding statute or administrative rule.

Dyer contends that the hearing notice was not specific enough to apprise him of the allegations against him and complains that the Department's Revocation Order therefore found several violations that were not listed in the hearing notice. We see no error. The APA required the Department to notify Dyer of the "facts or conduct warranting the intended action."[12] The APA further requires a "reasonable notice" that includes "a short and plain statement of the matters of fact and law asserted."[13] Under the Insurance Code, a notice must state " the matters to be considered at the hearing."[14]

The notice in this case met the statutory standards. It plainly charged Dyer, for example, with diverting or misappropriating escrow funds, which coincided with the specific instances of misappropriation found in the Revocation Order, such as the James Young lawsuit recovery of $30,000, which Dyer put in his own account; the existence of approximately $17,000 in an old escrow account that Dyer claimed as his own; and Dyer's maintaining a sweep account, which utilized escrow funds to earn interest for himself. Similarly, other allegations in the notice reasonably informed Dyer of the type of violations

---

[12] Ark. Code Ann. § 25–15–211(c) (Repl. 2014).

[13] Ark. Code Ann. § 25–15–208(a)(2)(C) (Repl. 2014).

[14] Ark. Code Ann. § 23–61–304(a) (Repl. 2012).

SLIP OPINION

that would later be cited in the Department's Order as a basis for revocation. The law did not require the Department to provide a detailed description of Dyer's precise instances of misconduct.

Dyer also argues that the Department's notice failed to advise him that his current ability to serve as an agent would be called into question. To the contrary, the notice stated that Dyer's license could be revoked as the result of the listed violations.

## VI. *Evidentiary Issues*

Dyer argues next that the Department's hearing officer erred in admitting certain documents into evidence. The documents in question were presented by Department witnesses and included the Chicago Title audit; the Stewart Guaranty audits; a spreadsheet that a Department investigator prepared with information obtained from another person; and the complaints filed by a consumer and a credit union. Dyer asked that the documents be excluded on hearsay and due-process grounds because they were prepared by persons who were not present to testify at the hearing and, consequently, were not subject to cross-examination. The hearing officer overruled Dyer's objection.

We agree with Dyer that the challenged documents likely contained hearsay, given that those who authored the documents were not present at the hearing.[15] We further recognize that parties to an administrative hearing are entitled to due process,[16] and have the right to

---

[15] *See New Empire Ins. Co. v. Taylor*, 235 Ark. 758, 362 S.W.2d 4 (1962).

[16] *Sparkman Learning Ctr., Inc. v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 194.

conduct cross-examination as may be required for a full and true disclosure of the facts.[17]

Nevertheless, we do not reverse the Department's admission of evidence in this case.

The rules of evidence are relaxed in an administrative proceeding.[18] In fact, hearsay evidence is normally admissible in administrative proceedings if it is reliable and probative.[19] Moreover, Dyer had the ability to subpoena witnesses and could have called the document preparers himself.[20] Alternatively, he could have asked for a continuance or a rehearing to call the declarants and cross-examine them.[21] In *Arkansas Department of Human Services v. A.B.*,[22] our supreme court held that, where an administrative scheme provides for the issuance of subpoenas by a party, that party cannot complain that his due-process rights were violated by not having the opportunity to cross-examine a witness. The facts in *A.B.* were somewhat different than this case—there, the party subpoenaed a witness but did not call him—but the principle remains the same. Dyer could have used the subpoena power that the law afforded him, or he could have asked for a postponement or an extended hearing. He did neither. We

---

[17] Ark. Code Ann. § 25-15-213(5) (Repl. 2014).

[18] *Ark. Contractors Lic. Bd. v. Butler Constr. Co., Inc.*, 295 Ark. 223, 748 S.W.2d 129 (1988).

[19] *See Ark. State Bd. of Nursing v. Long*, 8 Ark. App. 288, 651 S.W.2d 109 (1983). *See also* Ark. Code Ann. § 25-15-213(4)(providing that, while irrelevant, immaterial, and unduly repetitive evidence shall be excluded during an administrative hearing any other oral or documentary evidence, not privileged, may be received if it is of a type commonly relied upon by reasonably prudent people in the conduct of their affairs).

[20] *See* Ark. Code Ann. § 25-15-208(a)(7)(A).

[21] *See generally Farmer v. Everett*, 8 Ark. App. 23, 648 S.W.2d 513 (1983).

[22] 374 Ark. 193, 286 S.W.3d 712 (2008).

therefore uphold the administrative agency's refusal to exclude the evidence outright.

## VII. *Substantial Evidence*

Dyer argues that the violations found by the Department were not supported by substantial evidence. Substantial evidence is that which a reasonable mind might accept to support a conclusion and cause it to pass beyond speculation and conjecture.[23] We reiterate that we accord great deference to an administrative agency's expertise and give the evidence its strongest probative force in favor of the agency's findings.[24]

Dyer directs several assignments of error to various specific findings in the Revocation Order. However, we need not recount each of the Order's many findings, nor each of Dyer's individual challenges. It is sufficient to say that, based on the proof cited herein, the facts reveal a longtime pattern by Dyer of poor record-keeping, poor management, and questionable business practices that enabled his employee, Hudson, to commit fraud, even after she had embezzled from the agency on a previous occasion. The evidence in particular depicted Dyer's continuing failure to maintain proper records of his escrow accounts and his files. This facilitated Hudson's being able to continue her fraudulent scheme undetected, and led to many of Dyer's customers not receiving their title policies and deeds in a timely fashion, thus violating the record-keeping requirement of the Arkansas Title Insurance Act.[25]

The evidence also showed Dyer's disregard for the sanctity of his escrow accounts,

---

[23] *Ark. State Bd. of Chiropractic Exam'rs v. Currie*, 2013 Ark. App. 612.

[24] *Obigbo*, 2014 Ark. App. 675, 449 S.W.3d 335.

[25] Ark. Code Ann. § 23-103-414 (Repl. 2014).

which contained money belonging to clients. His personal use of or retention of funds in his escrow accounts was shown by substantial evidence, thereby proving an appropriation or diversion of funds for his own use in violation of the Insurance Code.[26]

Additionally, there was proof of Dyer's failure to place correct information on title policies regarding his license, business name, and the required statutory notices.[27] He argues that forms provided by Stewart Title were to blame for these omissions, but there was testimony that putting the proper information on the forms was his obligation and that he could have met the obligation.

These findings constitute substantial evidence that Dyer engaged in serious violations of Arkansas's insurance law, which warranted the sanction of revocation. We therefore affirm on this point.

## VIII. *Harshness of Sanctions*

Dyer argues that the sanction of revocation was too harsh. However, revocation was an available sanction for the violations that occurred.[28] He also argues that the Department's case was based on potential harm to others, rather than harm actually inflicted. The evidence shows otherwise, but, even so, we would not fault an administrative authority for using sanctions to prevent a foreseeable harm before it occurs.

Dyer further contends that his violations were technical rather than substantive. Some

---

[26] *See* Ark. Code Ann. § 23-64-223 (Repl. 2012).

[27] *See* Ark. Code Ann. § 23-64-510 (Repl. 2012), and § 23-103-413(2) (Repl. 2014).

[28] *See* Ark. Code Ann. § 23-64-512(a) (Repl. 2012).

of the violations could be deemed technical, but there was also evidence that Dyer failed to fulfill his fiduciary duties with regard to his clients' documents and money.[29]

IX. *Conclusion*

For the above reasons, we affirm the circuit court and the administrative agency's revocation order.

Affirmed.

GLADWIN, C.J., and VIRDEN, J., agree.

*Joseph C. Self*, for appellant.

*Amanda J. Andrews*, Assoc. Counsel, Ark. Ins. Dep't, for appellee.

---

[29]Dyer cites other license proceedings that were heard by the Department in which the sanction of revocation was not imposed. Without knowing the full details and evidence in those cases, we decline to compare them with the present case.